UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEREK A. VENTRESCA,<br><br>        Plaintiff,<br><br>v.<br><br>LAKE COUNTY, JOHN IDLEBURG, ARMOR CORRECTIONAL HEALTH SERVICES, INC., and ERIC MIZUNO,<br><br>        Defendants. | Case No. 1:19-cv-02009<br><br>Judge<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff DEREK A. VENTRESCA, by and through his undersigned attorneys, presents this Complaint against Defendants LAKE COUNTY, JOHN IDLEBURG, ARMOR CORRECTIONAL HEALTH SERVICES, INC., and ERIC MIZUNO (collectively, "Defendants") and alleges as follows:

### Nature of This Action

1. This is an action for money damages brought pursuant to 42 U.S.C. § 1983.

2. On or about August 25, 2016, Plaintiff was brought to the Lake County Sheriff's Adult Corrections Facility ("Lake County Jail") for intake, booking, and pre-trial detention.

3. At the time of his incarceration, Plaintiff was taking medically-prescribed Suboxone as treatment for his heroin addiction. Although Plaintiff made Defendants aware of this medical treatment during his medical intake interview on August 25, 2016, they refused to allow him to continue this treatment as part of their own policy and practice. Instead he was forced to abandon this prescribed treatment or any type of medication-assisted opioid withdrawal treatment and forced to undergo detoxification. After release from Lake County Jail in April

2017 to home confinement on the condition, among others, that he continue to refrain from using heroin, Plaintiff relapsed and was again imprisoned in Lake County Jail pending trial.

4. When asked about whether officials in the Lake County Sheriff's Office discussed how to prevent improper medical care and lawsuits arising from it, Chief Deputy Sheriff Dave Wathen, the former warden of Lake County Jail stated:

> For the most part, we believe that these claims are frivolous because people wind up being paid and that goes throughout the facility. And then other inmates just feed off of that because they know that, a lot of times, it's easier and costs less money to give them something to go away. And that's what a lot of them do, in my opinion.

Mr. Wathen's testimony demonstrates that the Lake County Sheriff's Office does not take claims of improper medical care seriously or make efforts to prevent improper medical care.

5. Through this action, Plaintiff seeks money damages for the harms he has suffered from unconstitutional deliberate indifference to his serious medical needs.

## The Parties, Venue, and Jurisdiction

6. Plaintiff DEREK A. VENTRESCA is a resident of the State of Illinois. Plaintiff was confined at Lake County Jail in Waukegan, Illinois at the time of certain of the events described in this Complaint. Plaintiff is no longer incarcerated.

7. Defendant LAKE COUNTY is a county incorporated under the laws of the State of Illinois. Under Illinois law, Lake County is required to pay a judgment entered against the Sheriff or any employees of the Lake County Sheriff's Office. Therefore Lake County is named in this Complaint as an indispensable party pursuant to Federal Rule of Civil Procedure 19(a)(1)(B) solely in its capacity as indemnitor of the Sheriff and employees of the Lake County Sheriff's Office.

8. Defendant JOHN IDLEBURG currently serves in the elected position of Sheriff of Lake County, Illinois (the "Sheriff's Office"). Sheriff Idleburg is sued solely in his official capacity. At the time of the events at issue in this Complaint, Mark Curran served as the Sheriff of Lake County, Illinois. The Sheriff's Office is an office of a county incorporated under the laws of the State of Illinois. The Sheriff's Office is responsible for the administration of the Lake County Jail.

9. At all relevant times, the individual vested with final policy making authority for the Sheriff's Office was Sheriff Curran.

10. Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. ("Armor") serves as the Lake County Jail's provider of medical services at all relevant times to this Complaint, and is responsible for providing inmates with appropriate medical care. With respect to each of the acts or omissions set forth herein, Defendant Armor acted under color of law in maintaining and implementing an unconstitutional practice, policy, and/or custom of deliberate indifference to inmate medical needs. Under the terms of Armor's agreement with Defendant Lake County, Armor has the responsibility of providing for prescribing and administering medication to inmates. Defendant Armor also agreed to "ensure that inmates entering Lake County on prescription medication continue to receive this medication in a timely fashion as prescribed or through acceptable alternate medication are provided as evidenced based clinically indicated." However, Defendants Armor and the Sheriff's Office as a matter of practice, policy, and/or custom refuse to provide for the continuation of prescription medication for opioid addiction withdrawal such as had been taken by Plaintiff at the time he was incarcerated and instead, force detoxification. The policy of flat out refusing to provide for the continuation of prescription medication for opioid addiction is not based on the individual assessment of the

3

medical needs of any individual inmate, including Plaintiff. Based on Plaintiff's investigation, he is informed and believes that this policy is not included in any policy manual governing medical care for inmates.

11. Defendant ERIC MIZUNO served as a doctor-Medical Director at Lake County Jail. Defendant Mizuno was responsible for the supervision of all medical personnel employed at Lake County Jail. Defendant Mizuno no longer works at the Lake County Jail. With respect to each of the acts or omissions set forth herein, Defendant Mizuno acted under color of law.

12. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) because the events and/or omissions giving rise to the claims stated herein occurred in Lake County, Illinois, within the Northern District of Illinois.

13. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a) and § 1331.

14. Each Defendant is subject to the exercise of personal jurisdiction in the Northern District of Illinois for the acts or omissions set forth herein, each of which occurred within the Northern District of Illinois.

**Facts**

15. On or about August 25, 2016, Plaintiff Derek A. Ventresca was brought to the Lake County Jail for intake, booking, and pre-trial detention.

16. At that time, Plaintiff had not received a trial for, or been convicted of, the offenses for which he was being detained.

17. On August 25, as part of the booking process, Plaintiff was given a medical intake interview by Kyle Connor, a licensed practical nurse employed by Defendant Armor. The purpose of the medical intake interview was to obtain information from Plaintiff about his health, medical history, and any medications he was currently taking.

18. During the interview, Plaintiff advised Nurse Connor that he was addicted to heroin and that it had been three years since his last injection. He stated that he was taking medically-prescribed Suboxone to treat his heroin addiction which he was required to take daily by an orally-ingested strip. Plaintiff advised that he had not taken Suboxone since August 22, the day before he had been arrested. He also stated that he previously had problems withdrawing from heroin.

19. Nurse Connor was not permitted to order or prescribe medication, but passed this information to another nurse practitioner, Mellody Standiford, also an employee of Defendant Armor. On August 27, Nurse Standiford did not order continuation of Plaintiff's medically-prescribed Suboxone treatment but instead, ordered medications for Plaintiff according to Defendant Armor's standard protocol designed to treat the effects of withdrawal from Suboxone: essentially ibuprofen, anti-diarrhea, and anti-nausea medications.

20. On August 29, 2016, Nurse Practitioner Patricia McDougall completed an urgent referral task entered by Nurse Connor in connection with Plaintiff's Suboxone treatment. McDougall did not personally evaluate or examine Plaintiff at that time, nor did she order or prescribe a continuation of Plaintiff's Suboxone treatment or refer Plaintiff to Defendant Mizuno for continuation of Plaintiff's Suboxone treatment.

21. On September 1, 2016, Defendant Mizuno approved the medications ordered on August 27, 2016 for Plaintiff's Suboxone withdrawal. Defendant Mizuno did not personally evaluate or examine Plaintiff at that time. Neither Defendant Mizuno nor any of the other medical staff ordered or prescribed a continuation of the Suboxone medication Plaintiff had been taking prior to his arrest as part of his medication-assisted treatment of heroin addiction.

22. The decision to discontinue Plaintiff from his prescribed Suboxone medication was not based on any clinical judgment of Defendant Mizuno, Defendant Armor, or its employees. Rather, it was the undisclosed policy of Defendants Armor and the Sheriff's Office to discontinue the Suboxone medication that had been prescribed Plaintiff and to force detoxification regardless of whether the discontinuation of Suboxone treatment was medically proper. In the words of Defendant Mizuno, "It was not Armor's practice . . . to continue anyone on a Methadone or Suboxone replacement program. . . . It just wasn't the protocol."

23. This policy of discontinuing medically-prescribed addiction treatment and forcing detoxification was also the policy of Defendant Sheriff's Office. Defendants did not disclose this policy to Plaintiff, it was not set forth in any written policy, and it is directly contradicted by the written policies of Defendants.

24. The Sheriff's Office Policy and Procedure Manual, Medical Services policy, provides that "[u]pon admission to the jail, inmate's records will be reviewed and the health authority will determine the need for follow-up treatment[, and i]nmates with special needs (i.e. a chronic illness . . .) will be identified." (Policy and Procedure Manual, Medical Services ¶ 25.) The Manual also states that "[a]ny inmate requesting a special needs program will be given due consideration and will have a program tailored to that inmate, if it is found to be appropriate." (*Id.* ¶ 26.) In addition, "[i]nmates with chronic conditions such as hypertension, diabetes and other diseases receive periodic care and treatment that includes monitoring of medications, laboratory testing and use of chronic care clinics. Medications are monitored and / or adjusted as needed in accordance with the established treatment plan and at a physician's discretion." (*Id.* ¶ 75.)

25. Nevertheless, although the Manual says that "[i]nmates have access to a chemical dependency treatment program" and establishes "minimum" standards for "the clinical management of chemically dependent inmates" "[w]hen a chemical dependency program exists" (*id.* ¶¶ 58–59), it is clear from Defendant Mizuno that the Lake County Jail does not in fact provide "access to a chemical dependency treatment program" for continuing medically-prescribed addiction treatment or in any way meet the minimum standards, which include:

   a. A standardized diagnostic needs assessment administered to determine the extent of use, abuse, dependency, and/or codependency

   b. An individualized treatment plan developed and implemented by a multidisciplinary clinical team that includes medical, mental health, and substance abuse professionals

   c. Prerelease relapse-prevention education, including risk management

   d. Inmate involvement in aftercare discharge plans

(*Id.* ¶ 59.)

26. Defendant Mizuno has conceded that opioid addiction is an illness. Opioid use disorder is a chronic brain disease with potentially deadly complications. Signs of opioid use disorder include craving, increasing tolerance to opioids, withdrawal symptoms, and a loss of control.

27. Like other chronic diseases, opioid use disorder often involves cycles of relapse and remission. Without treatment or other recovery, patients with opioid use disorder are frequently unable to control their use of opioids. Opioid use disorder is progressive and can result in disability or premature death.

28. Drug addiction is a "disability" under the Americans with Disabilities Act. *See* 42 U.S.C. §§ 12102 and 12131(2); 28 C.F.R. § 35.108 ("The phrase physical or mental impairment includes, but is not limited to . . . drug addiction, and alcoholism.").

29. Although the Americans with Disabilities Act does not apply to current active users of illegal drugs, it does apply to people like Plaintiff who was participating in a supervised drug rehabilitation program. *See* 42 U.S.C. § 12210(a), (b); *Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002); *Collings v. Longview Fiber Co.*, 63 F.3d 828, 831–32 (9th Cir. 1995).

30. One medication used in the medication-assisted treatment of heroin addiction is Suboxone, which contains buprenorphine and naloxone. Suboxone has been approved by the United States Food and Drug Administration for treatment of opioid dependence. Suboxone helps to prevent the "high" of taking opioids, suppresses withdrawal, and reduces cravings. Buprenorphine is a partial agonist that activates opioid receptors approximately 20 to 40 percent.

31. Buprenorphine binds tightly to the opioid receptor so that someone taking one of these medications is not able to feel a "high" from taking heroin or fentanyl because those drugs are not able to activate the opioid receptor. Buprenorphine also facilitates extinction learning, because patients learn that they will not get the same "high" from taking drugs like heroin or fentanyl.

32. Buprenorphine has been clinically proven to reduce opioid use more than (1) no treatment, (2) outpatient treatment without medication, (3) outpatient treatment with placebo medication, and (4) detoxification only.

33. Medication-assisted treatment of addiction using drugs such as buprenorphine is far more effective than detoxification alone, which produces very poor outcomes. Forced detoxification, such as Plaintiff suffered here, is especially dangerous for people with opioid use

disorder who are incarcerated. Prisoners with opioid use disorder have a heightened risk for relapse and overdose.

34. For example, the President's Commission on Combating Drug Addiction and the Opioid Crisis found that "[i]n the weeks following release from jail or prison, individuals with or in recovery from [opioid use disorder] are at elevated risk of overdose and associated fatality."[1]

35. As the Commission further recognized, "[medication-assisted treatment of opioid addiction] has been found to be correlated with reduced risk of mortality in the weeks following release and in supporting other positive outcomes. A large study of individuals with [opioid use disorder] released from prison found that individuals receiving [medication-assisted treatment] were 75% less likely to die of any cause and 85% less likely to die of drug poisoning in the first month after release." *Id.*

36. The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends use of medication-assisted treatment for people with opioid use disorder in the criminal justice system.[2]

37. The National Commission on Correctional Health Care has also adopted a position statement calling for the "[c]ontinuation of prescribed medications for substance use disorders," such as buprenorphine and methadone.[3]

38. The United States Department of Justice's Adult Drug Court Discretionary Grant Program has gone even further, requiring grantees to permit the use of medication-assisted treatment.[4]

---

[1] Final Report at 72 (2017), available at https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Final_Report_Draft_11-1-2017.pdf
[2] Kyle Kampman & Margaret Jarvis, American Society of Addiction Medicine (ASAM) National Practice Guideline for the Use of Medications in the Treatment of Addiction Involving Opioid Use, 9 J. Addict. Med. 1, 10 (2015), https://www.asam.org/docs/default-source/practice-support/guidelines-and-consensus-docs/asam-national-practice-guideline-supplement.pdf
[3] National Commission on Correction Health Care, Substance Use Disorder Treatment for Adults and Adolescents, NCCHC (Oct. 23, 2016), https://www.ncchc.org/substance-use-disorder-treatment-for-adults-and-adolescents.

39. As recognized by these authorities, opioid use disorder is a chronic relapsing condition that requires medically-appropriate treatment just like other chronic diseases. Once patients start on drugs such as buprenorphine, they need to be maintained on that treatment under medical supervision to give them the best chances of success.

40. In April 2017, after having been incarcerated without trial for approximately eight months, Plaintiff was released to home confinement on the condition, among others, that he continue to refrain from using heroin. In August 2017, he relapsed in addiction and resumed using heroin, and later was again imprisoned in Lake County Jail pending trial. A contributing factor to his relapse was his forced withdrawal from Suboxone during the time of his incarceration.

41. Plaintiff filed grievances through the Lake County Jail's grievance system. Those grievances failed to resolve Plaintiff's need for medical care. Plaintiff did not file a grievance regarding Defendants' policy against continuous medically prescribed Suboxone because that policy was not disclosed to him during the time of his incarceration. He first learned of the policy when Defendant Mizuno disclosed the existence of this policy during his deposition taken on December 3, 2018. Similarly, Plaintiff did not become aware until this December 3, 2018 deposition that his relapse into heroin addiction, were in part caused by Defendants' policy of refusing to provide Suboxone to inmates but instead forcing them to undergo cold-turkey detoxification.

## COUNT I
### (42 U.S.C. § 1983 – Deliberate Indifference)

42. Plaintiff realleges paragraphs 1 through 41 as if fully set forth herein.

---

[4] U.S. Dep't of Justice, Adult Court Discretionary Grant Program FY 2018 Competitive Grant Announcement, OMB No. 1121-0329 (2018), https://www.bja.gov/funding/DrugCourts18.pdf.

43. Defendant Mizuno was aware that Plaintiff had an objectively serious medical need in the form of his heroin addiction alleged in paragraph 18, but nonetheless deprived him of access to appropriate treatment for that need, disregarding the excessive risk that a lack of treatment posed to Plaintiff's health and safety.

44. Defendant Mizuno's conduct violated Plaintiff's Fourteenth Amendment due process rights.

45. Plaintiff was harmed by the unconstitutional deliberate indifference to his serious medical needs, including but not limited to further suffering and lack of treatment for his heroin addiction alleged in paragraph 18 herein, resulting in relapse alleged in paragraph 40.

WHEREFORE, Plaintiff Derek A. Ventresca requests judgment as follows:

a. Entering judgment against Defendant Mizuno;

b. Awarding Plaintiff compensatory damages;

c. Awarding Plaintiff's attorneys' fees and costs; and

d. Awarding any other relief that the Court deems just.

## COUNT II
**(42 U.S.C. § 1983 – *Monell* Claim for Deliberate Indifference)**

46. Plaintiff realleges paragraphs 1 through 45 as if fully set forth herein.

47. Defendants Armor and the Sheriff's Office had a practice, policy, and/or custom of refusing to continue medication-assisted treatment for opioid addiction, including forcing detoxification of inmates who had been taking medically-prescribed Suboxone, despite the fact that medication-assisted treatment of addiction is far more effective than detoxification alone, which produces very poor outcomes, including an increased risk of relapse and overdose. Defendants Armor and the Sheriff's Office implemented this practice, policy, and/or custom through Armor's employees, including Defendant Mizuno.

48. This practice, policy, and/or custom resulted in Plaintiff being given improper medical treatment, including discontinuing his medically-prescribed Suboxone treatment for his heroin addiction and being forced to undergo detoxification. Thus, this practice, policy, and/or custom resulted in deliberate indifference to Plaintiff's heroin addiction, leading to relapse alleged in paragraph 40.

49. This practice, policy, and/or custom of refusing to continue medication-assisted treatment for opioid addiction and forcing detoxification has resulted in the deprivation of appropriate medical care not just to Plaintiff, but to other inmates as well, increasing their risk of relapse and overdose. Thus, this practice, policy, and/or custom resulted in deliberate indifference to those inmates' opioid addictions.

50. Defendant Lake County is obligated under Illinois law to indemnify Defendant Sheriff's Office for judgments awarded against it.

51. Plaintiff was harmed by the unconstitutional deliberate indifference to his serious medical need, including but not limited to further suffering and lack of treatment for his heroin addiction alleged in paragraph 18 herein, resulting in relapse alleged in paragraph 40.

WHEREFORE, Plaintiff Derek A. Ventresca requests judgment as follows:

a. Entering judgment against Defendant Sheriff's Office and Defendant Armor;

b. Awarding Plaintiff compensatory damages;

c. Awarding Plaintiff's attorneys' fees and costs;

d. Ordering that Defendant Lake County shall indemnify the Sheriff's Office for any judgment for damages arising from its actions; and

e. Awarding any other relief that the Court deems just.

Dated:  March 22, 2019

Respectfully submitted,

DEREK A. VENTRESCA

By: /s/ Michael R. Hassan
    One of His Attorneys
    Michael R. Hassan
    mhassan@porterwright.com
    Andrew Foreman
    aforeman@porterwright.com
    Porter Wright Morris & Arthur LLP
    321 North Clark Street, Suite 400
    Chicago, IL 60654
    312-756-8500

559534